# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| MONSIE ROSARIO, | |
| Plaintiff, | Case No. 16-cv-05648 |
| v. | |
| AUNT MARTHA'S YOUTH SERVICE CENTER d/b/a AUNT MARTHA'S HEALTH CENTER, | Judge John Robert Blakey |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Monsie Rosario sued Defendant Aunt Martha's Youth Service Center d/b/a Aunt Martha's Health Center under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Plaintiff alleges that Defendant violated Title VII by creating a hostile work environment for her, based upon her race or national origin. [1]; [27] at 1 n.1. Defendant moved for summary judgment. [18]. For the reasons explained below, Defendant's motion is granted.

### I. Background

The following facts come from Defendant's Local Rule 56.1 statement of material facts [20] and Plaintiff's Local Rule 56.1 statement of additional facts [28]. Throughout Defendant's response to Plaintiff's statement of facts, Defendant denied many facts by simply writing "Denied" or by providing explanations that lacked record citations. *See, e.g.*, [36] ¶¶ 13, 18, 26. Under Local Rule 56.1(b)(3)(B), a party denying a fact must provide "specific references to the affidavits, parts of the

1

record, and other supporting materials relied upon" for the denial. A denial that lacks supporting citations to the record is inadequate. *See Yost v. Chi. Park Dist.*, 17 F. Supp. 3d 803, 806 (N.D. Ill. 2014). This Court thus deems admitted any facts that Defendant denied without support.

Defendant runs a nonprofit community health center where Plaintiff works as a family case manager (FCM). [20] ¶¶ 2, 5. Plaintiff has worked for Defendant as an FCM since about November 2010. *Id.* ¶¶ 4, 6. As an FCM, Plaintiff works with clients and makes home visits to ensure that infants have current immunizations. *Id.* ¶ 9. Hope Keeper-Young, Plaintiff's FCM supervisor since 2011, has always rated Plaintiff as meeting or exceeding expectations in her performance reviews. [28] ¶¶ 7–8, 35.

Plaintiff is a native Spanish speaker; she was born in Puerto Rico and moved to the continental United States in 1989 at age 18. *Id.* ¶ 1. Plaintiff learned English starting in first grade, and used mainly English-language textbooks from first grade through high school. *Id.* ¶ 2. Plaintiff has worked primarily in the medical field since moving to the continental United States. *Id.* ¶ 5. In Plaintiff's professional life—with the exception of the conduct described below—people have not told her that they have trouble understanding her accent. *Id.* ¶ 4.

A. **July 2015 Incident**

On July 30, 2015, Plaintiff attended training on patient-tracking forms with Keeper-Young; Jazmine Mack, another FCM supervisor; Cassandra Jenkins, Plaintiff's division manager; and several of Plaintiff's fellow FCMs. [20] ¶ 10.

During the training, Plaintiff asked a question, and Mack said she could not understand Plaintiff.  *Id.* ¶ 11.  Mack then described a phone call she had with Plaintiff two weeks earlier: "Oh my God, during that phone call I had with you I could not understand anything you were saying and I was like, 'I can't hear you, I can't hear you' and I just laughed and hung up the phone."  [28] ¶ 10.  Plaintiff understood that Mack was implying that she feigned being unable to hear Plaintiff during the call because she could not understand Plaintiff's accent, but Plaintiff denies that Mack said anything along those lines during their call.  *Id.* ¶ 11.

In response, Plaintiff said, "But you answered my question."  *Id.* ¶ 12.  Mack turned to Keeper-Young and said, "I'm sorry you deal with this all the time because I can't understand her at all."  *Id.*  Keeper-Young started to respond with, "Yes, I deal with this every day and . . . ," when she was cut off by laughter.  *Id.* ¶ 13.  Mack said, "It's hard to understand her.  Her accent is very deep.  I have a Hispanic who works in my office and they speak perfect English."  *Id.*  Keeper-Young and Mack commented on Plaintiff's accent and laughed together for about 10 minutes, even after Plaintiff asked if they could move forward with the training.  *Id.* ¶¶ 14–16.  Plaintiff noticed that Jenkins laughed too; she testified that the entire interaction "deeply embarrassed" her.  *Id.* ¶ 14.  Before this training session, Keeper-Young never told Plaintiff that she had any trouble understanding her, and never noted any communication problems in Plaintiff's performance reviews.  *Id.* ¶¶ 34, 35.

When the meeting broke for lunch, Plaintiff started sobbing and went to her office to calm down.  *Id.* ¶ 19.  Plaintiff told a coworker she was going home because

3

the incident was "unacceptable," and the coworker told Keeper-Young that Plaintiff was leaving. *Id.* ¶¶ 19–20. When Keeper-Young approached Plaintiff to ask why she was leaving, Plaintiff said, "You know what happened and you know the reason I am leaving." *Id.* ¶ 20.

From her car, Plaintiff called Defendant's HR department in tears and spoke to Renee Wheeler. *Id.* ¶ 21; [20] ¶ 23. Wheeler told Plaintiff to go home and said she would email Plaintiff a complaint form. [20] ¶ 24. Plaintiff did not go to work the next day, a Friday, but she returned to work the following Monday. *Id.* ¶¶ 25–26. Plaintiff submitted the complaint form to HR between August 5 and August 10, 2015. [28] ¶ 22. Wheeler then contacted Plaintiff to arrange a conference call with the head of Defendant's Health Division, but Wheeler failed to call Plaintiff at the scheduled time for both appointments they made. *Id.* ¶¶ 22–24. In October 2015, Wheeler tried to schedule a third conference call, but Plaintiff told Wheeler that she had missed the meeting too many times and should contact Plaintiff's lawyer instead. [20] ¶ 33.

### B. Other Incidents

After the July 2015 incident, Plaintiff estimates that Keeper-Young made at least seven disparaging comments about her accent through December 2015. [28] ¶ 25. On one occasion, Keeper-Young taught a class for patients and Plaintiff translated the class into Spanish. *Id.* Keeper-Young asked a student if Plaintiff spoke correctly, saying, "She has a very deep accent, so I don't know if everybody understands her." *Id.* During a December 2015 group meeting, Keeper-Young put

4

her hand to her ear whenever Plaintiff spoke, and said "What?" repeatedly as if she did not understand. *Id.* ¶ 26. When Keeper-Young asked someone to translate for Plaintiff, Plaintiff's coworker responded, "Please, Hope. She spoke clearly." *Id.*

In 2016, Keeper-Young continued making disparaging comments about Plaintiff's accent. Plaintiff testified about four specific incidents, and estimated that Keeper-Young harassed her about her accent seven times total throughout the year. *Id.* ¶¶ 27–31. In January 2016, while speaking to a client in front of Plaintiff, Keeper-Young said, "She has a very thick accent, so just in case you don't understand, just talk to me." *Id.* ¶ 27. In October 2016, Plaintiff and another FCM were in Keeper-Young's office discussing patients when Keeper-Young told Plaintiff to "move away" because she did not understand Plaintiff. *Id.* ¶ 30. Keeper-Young also asked the other FCM to translate for Plaintiff, and the FCM responded: "I don't need to translate anything because she said it right. The only thing you don't want to accept is that she has an accent." *Id.*

Finally, in December 2016, Keeper-Young asked Plaintiff to translate a Spanish letter, but repeatedly questioned her translation and then called another FCM over to translate the letter, saying: "I don't get Monsie. I don't even know what she's saying." *Id.* ¶ 31. The other FCM told Keeper-Young that Plaintiff had translated correctly, and asked Keeper-Young: "Hope, can you stop doing that?" *Id.*

Aside from comments directed at Plaintiff, Keeper-Young "makes a face and makes comments" when Spanish-speaking clients come in. *Id.* ¶ 32. Keeper-Young sometimes sends Plaintiff over to Spanish-speaking clients by saying, "Come on,

5

speak your language to them," or, "It's your people." *Id.* During an office move, Keeper-Young complained that the movers did not understand her because they spoke Spanish, but a mover responded in English that he understood everything Keeper-Young said and that she offended him. *Id.* ¶ 33.

Plaintiff never complained to HR or anyone within Defendant's organization about Keeper-Young's behavior after the July 2015 incident. [20] ¶ 47. Between July 2015 and Plaintiff's deposition in January 2017, she did not seek any medical treatment or counseling because of Keeper-Young's conduct. *Id.* ¶ 50. And since July 2015, Plaintiff's job title, hours, and pay have stayed the same. *Id.* ¶¶ 35–36.

## II. Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A genuine dispute as to a material fact exists when, based upon the evidence, "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must evaluate evidence in the light most favorable to the non-moving party. *Id.* at 255. The moving party has the burden of establishing that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To show a genuine dispute as to a material fact, the non-moving party must use "particular materials in the record" for support, and cannot rely upon the pleadings or speculation. *Olendzki v. Rossi*, 765 F.3d 742, 746 (7th Cir. 2014).

## III. Analysis

### A. Hostile-Work-Environment Claims Generally

Title VII prohibits discriminating against any individual with respect to the individual's "compensation, terms, conditions, or privileges of employment, because of such individual's race . . . or national origin." 42 U.S.C. § 2000e-2(a)(1). That prohibition bars employers from creating a hostile work environment, meaning an environment "so pervaded by discrimination that the terms and conditions of employment were altered." *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2441 (2013).

To succeed on a hostile-work-environment claim based upon race or national origin, a plaintiff must show that: (1) she was subject to unwelcome harassment; (2) the harassment happened because of her race or national origin; (3) the harassment was severe or pervasive enough to alter the conditions of her work environment; and (4) there is a basis for holding the employer liable. *Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 895–96 (7th Cir. 2016). Courts consider the totality of the circumstances in deciding whether a work environment is hostile, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998). A workplace must be "hellish" to be actionable. *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 645 (7th Cir. 2005) (internal quotation marks omitted).

**B.  This Case**

Plaintiff claims that Keeper-Young's conduct during the July 2015 incident, and over the 18 months following, created a hostile work environment. Defendant contends that Plaintiff fails to satisfy the four-part test for a hostile work environment. Because this Court agrees that Plaintiff cannot satisfy the third prong—and each prong is necessary for Plaintiff to succeed on her claim, *Cole*, 838 F.3d at 896—this Court addresses only the third prong.

**1.  Severe or Pervasive Harassment**

Defendant argues that Plaintiff has not met this prong because Keeper-Young's comments were not severe enough to interfere with her work performance and were relatively isolated incidents spread out over 18 months. To succeed on a hostile-work-environment claim, Plaintiff must show, based upon the totality of the circumstances, that the harassment was severe *or* pervasive enough "to alter the conditions" of her employment and create a "hellish" workplace. *Whittaker*, 424 F.3d at 645. This Court agrees that Plaintiff has not made that showing here.

Keeper-Young's behavior, although rude and unacceptable, was not severe enough to create a hellish work environment for Plaintiff. Plaintiff testified that she continued receiving good performance reviews after July 2015, indicating that the harassment did not affect her job performance. [28] ¶ 35. Indeed, Plaintiff offered no evidence that she struggled to do her job or complete certain tasks after Keeper-Young started commenting on her accent, aside from missing one day of work immediately after the July 2015 incident. [20] ¶ 25. Plaintiff's situation

contrasts sharply with that of the successful plaintiff in *Gendry v. Export Packaging Co.*, who "hated" her job, "often cried when she went to work," and sought medical treatment "for anxiety and depression caused by the oppressive workplace environment." 238 F.3d 842, 851 (7th Cir. 2001).

Although Plaintiff complained to HR about the July 2015 incident, she never complained to HR about Keeper-Young's later comments. That failure to act contradicts Plaintiff's claim that the harassment was severe or pervasive. *See Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 545 (7th Cir. 2011) ("Yancick's inaction in following up on his complaints or taking them up the chain" through HR "belies the notion" that the harassment was severe or pervasive.) Finally, Keeper-Young never physically threatened Plaintiff, nor was she openly racist towards Plaintiff. *Cf. Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 802 (7th Cir. 2000) (overturning summary judgment for an employer because the plaintiff employee alleged two sufficiently severe instances of sexual harassment: her supervisor held her face and stuck his tongue down her throat, and the next day nearly unfastened her bra before another employee walked in). Even taking the evidence in the light most favorable to Plaintiff, this Court finds that no reasonable jury could conclude that Keeper-Young's comments were severe enough to create a hellish environment. *Faragher*, 524 U.S. at 787–88.

As for Keeper-Young's comments (and facial expressions) directed at Spanish-speaking patients or movers, "secondhand harassment" is necessarily less severe than direct harassment. *Ellis v. CCA of Tenn. LLC*, 650 F.3d 640, 647 n.2 (7th Cir.

9

2011). No reasonable jury could conclude that the occasional secondhand comments Plaintiff described created a "hellish" environment for Plaintiff.

Keeper-Young's behavior was also not pervasive enough to create a hellish work environment. Construing the facts in the light most favorable to Plaintiff, *Anderson*, 477 U.S. at 255, Keeper-Young criticized Plaintiff about her accent 15 times (including the July 2015 incident) over 18 months. [28] ¶¶ 25–31. In other words, Keeper-Young averaged one inappropriate comment to Plaintiff about once every five weeks. Of the 15 comments over those 18 months, seven allegedly occurred between October and December 2015. *Id.* ¶ 25. During that period, Keeper-Young averaged one comment about every two weeks.

Although this Court has no doubt that Keeper-Young's comments justifiably upset Plaintiff, such intermittent harassment does not qualify as "pervasive" under the law, regardless of which period this Court focuses on. In the Seventh Circuit, it is "well settled that relatively isolated instances of non-severe misconduct will not support a claim of a hostile environment." *Whittaker*, 424 F.3d at 646. In *Baskerville v. Culligan Intern Co.*, for example, the Seventh Circuit overturned a jury verdict for a plaintiff who testified to at least nine sexually inappropriate things that her supervisor said to her over seven months. 50 F.3d 428, 431 (1995) ("A handful of comments spread over months is unlikely to have so great an emotional impact as a concentrated or incessant barrage.")

Keeper-Young's 15 comments make up a large "handful" of comments, but, as in *Baskerville*, they were spread out over many months, and thus, like the seven

10

comments over three months, they fail to inflict "so great an emotional impact" as a continuous stream. *Id.* For comparison, the plaintiff employee in *Benitez v. American Standard Circuits, Inc.* survived summary judgment by alleging that his supervisor not only grabbed his crotch on two occasions, but also tried to grope him at least twice a week for eight years. 678 F. Supp. 2d 745, 758 (N.D. Ill. 2010); *see also Smuk v. Specialty Foods Group, Inc.*, No. 13-cv-8282, 2016 WL 3742849, at *5 (plaintiff employee survived summary judgment by alleging, among other things, that his supervisor grabbed the plaintiff's butt and crotch and commented about the plaintiff's body almost daily for eight years). In those cases, each individual incident might not have sufficed to create a hostile work environment, but the aggregate harassment became "an incessant part of the workplace environment" that was "pervasive enough and corrosive enough" to meet the standard for liability. *Jackson v. Cnty. of Racine*, 474 F.3d 493, 499 (7th Cir. 2007).

Plaintiff has not shown that Keeper-Young's occasional comments formed "an incessant part of [her] workplace environment." *Id.* Because Plaintiff's evidence "is insufficient to show a workplace permeated with discriminatory ridicule, intimidation, and insult," Defendant's summary judgment motion must be granted. *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014) (internal quotation marks omitted); *see also Taylor v. W. & S. Life Ins. Co.*, 966 F.2d 1188, 1191 (7th Cir. 1992) (finding a hostile work environment where the plaintiff's boss consistently made racial comments and once held a gun to plaintiff's head, took a photo of the incident, and later showed it at a staff meeting while making racial

jokes); *Brooms v. Regal Tube Co.,* 881 F.2d 412, 417 (7th Cir. 1989) (finding a hostile work environment where a human resources manager threatened to kill the plaintiff and repeatedly showed her racist pornographic photos).

**IV.     Conclusion**

Defendant's motion for summary judgment [18] is granted. Civil case terminated.

Dated: October 30, 2017

                                        Entered:

                                        _____
                                        John Robert Blakey
                                        United States District Judge